IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

\* \* \* \* \* \* \* \* \*

|  |  |  |
|---|---|---|
| AMERICAN NATIONAL PROPERTY AND CASUALTY COMPANY, | ) ) ) | Civil No. 2:11-CV-250 BSJ |
| Plaintiff, | ) ) | **MEMORANDUM OPINION** |
| vs. | ) ) | **& ORDER RE: CROSS-MOTIONS** **FOR SUMMARY JUDGMENT** |
| CHRIS CHECKETTS and SANDRA CHECKETTS, as individuals and as parents of JACOB CHECKETTS, a minor, | ) ) ) ) ) ) | **(Fed. R. Civ. P. 56)** |
| Defendants. | ) | |

```
┌─────────────────────────────────┐
│            FILED                │
│  CLERK, U.S. DISTRICT COURT     │
│    May 21, 2012 (2:42pm)        │
│      DISTRICT OF UTAH           │
└─────────────────────────────────┘
```

\* \* \* \* \* \* \* \* \*

On March 16, 2011, plaintiff AMERICAN NATIONAL PROPERTY AND CASUALTY

COMPANY ("ANPAC"), filed this diversity action seeking declaratory relief pursuant to 28

U.S.C. § 2201(a) (2006 ed.), to which defendants CHRIS CHECKETTS and SANDRA

CHECKETTS ("the Checketts") responded by filing an Answer on May 31, 2011 (dkt. no. 4).

On September 30, 2011, the Checketts filed a Motion for Summary Judgment (dkt. no. 11), as

did ANPAC (dkt. no. 13). These cross-motions were heard on November 9, 2011, at which time

the court took both motions under advisement. (*See* Minute Entry, dated November 9, 2011 (dkt.

no. 20).)

Having reviewed and considered the motions, memoranda and exhibits submitted by the

parties, and having heard and considered the arguments of counsel, the court now rules as

follows:

**FACTUAL BACKGROUND**

On or about Sept. 6, 1996, Sandra Checketts signed two applications for automobile insurance with ANPAC, requesting insurance coverage for three vehicles: (1) a 1995 Chevrolet Tahoe; (2) a 1992 Dodge D250; and (3) a 1984 Pace motor home. The two applications listed Chris Checketts and Sandra Checketts, husband and wife, as the only drivers on the policy, and requested liability coverage limits of $100,000 per person/$300,000 per incident.[1] One section of the ANPAC application form explained:

**UNDERINSURED MOTORIST BODILY INJURY COVERAGE (UIMBI)**

UIMBI Coverage provides you with additional insurance benefits if you or someone in your automobile suffers bodily injury because of an automobile accident caused by another party who is primarily at fault, but who does not have enough insurance to compensate for the injuries. Underinsured Motorist Limits must be the same for all vehicles on policy.

Beneath this explanation were printed a series of check boxes. Ms. Checketts checked the box next to the language "I do NOT desire to purchase UIMBI."[2]

ANPAC issued an automobile insurance policy to the Checketts, Policy No. 43-A-E98-832-9 ("the Policy"), and thereafter sent semi-annual renewal notices to the Checketts, each of which summarized the different types and amounts of insurance coverage provided under the Policy. From the first renewal notice in March 1997 through the notice sent in September 2007, each recited that "UNDERINSURED MOTORIST COV" was "REJECTED," and further stated

---

[1](*See* Memorandum in Support of Defendants' Motion for Summary Judgment, filed September 30, 2011 (dkt. no. 12) ("Checketts Mem."), at 3 ¶¶ 1-4; ANPAC's Memorandum in Opposition to Defendants' Motion for Summary Judgment, filed October 31, 2011 (dkt. no. 16) ("ANPAC Opp. Mem."), at iii ¶¶ 1-4.)

[2](Exhibit A-4 to Checketts Mem.)

that "**THIS POLICY DOES NOT PROVIDE UNDERINSURED MOTORIST

COVERAGE**" on a separate line.[3]  None of the renewal notices ANPAC sent to the Checketts

from 1997 through 2007 included any explanation of the purpose of underinsured motorist

coverage or the costs associated with increasing such coverage in amounts up to and including

the maximum amount available under the Policy.[4]

The Checketts continued to maintain their ANPAC auto insurance coverage under the

Policy through the ensuing years, until at least the end of 2007.[5]  In the ten years from ANPAC's

issuance of the Policy in 1996 and early 2007, there were several changes made to the Checketts'

auto insurance. Specifically, at the time of the first ANPAC renewal notice dated March 16,

1997, ANPAC provided auto insurance coverage for the following two vehicles: (1) a 1995

Chevrolet Tahoe, and (2) a 1992 Dodge D250, and listed only Sandra and Chris Checketts as

drivers on the policy.[6]  By 2007, all of the vehicles covered by the Policy had changed: the March

6, 2007 ANPAC renewal notice listed four covered vehicles: (1) a 1999 Chevrolet Suburban; (2)

a 1989 Ford F-150; (3) a 1999 Chevrolet Tahoe; and (4) a 2000 Chevrolet Geo.  The March 2007

notice also listed an additional driver, the Checketts' oldest daughter Alisha, who had turned

sixteen years old on Aug. 28, 2005 and was extended auto insurance coverage by ANPAC at the

---

[3](ANPAC's Memorandum in Support of Motion for Summary Judgment, filed September 30, 2011 (dkt. no. 14) ("ANPAC Mem."), at iv ¶¶ 6-8; Memorandum in Opposition to Plaintiff ANPAC'S Motion for Summary Judgment, filed October 31, 2011 (dkt. no. 15) ("Checketts Opp. Mem."), at 4 ("Respondents do not dispute any of the material facts set forth by ANPAC in its Memorandum in Support of Motion for Summary Judgment.").)

[4](Checketts Mem. at 4 ¶ 10; ANPAC Opp. Mem. at iv ¶ 10.)

[5](Checketts Mem. at 4 ¶ 7; ANPAC Opp. Mem. at iii ¶ 7.)

[6](Checketts Mem. at 5 ¶¶ 11-12; ANPAC Opp. Mem. at iv-v ¶¶ 11-12.)

Checketts' request sometime on or before March 6, 2006.  The substitution and addition of these vehicles and a third driver to the coverage under the Policy was necessarily made at the Checketts' request.[7]

These changes significantly increased the premiums under the Policy.  The addition of Alisha to the policy resulted in a premium increase on the family's 1999 Chevrolet Suburban from $195.00 to $396.00 every six months, an overall increase of $402.00/year to the family's automobile insurance expense.  At some time between Sept. 6, 2006 and Mar. 6, 2007, the Checketts added a fourth vehicle to their coverage under the Policy, namely a 2000 Chevrolet Metro. The combination of adding their teenage daughter as a driver and the Chevrolet Metro as a vehicle effectively increased their semi-annual insurance expense from $655.00 to $1,190.00, a premium increase of over eighty percent.[8]

On June 18, 2007, Sandra Checketts and her seven-year-old son Jacob Checketts were involved in a collision on U.S. Highway 89 when Michael Hedden, a 16-year-old driver, swerved into Ms. Checkett's lane and hit Ms. Checkett's car head-on at full highway speed.  Both Ms. Checketts and her son sustained serious injuries.

After exhausting Mr. Hedden's minimal insurance coverage, the Checketts made an Underinsured Motorist coverage demand on ANPAC, which was denied by ANPAC.

---

[7](Checketts Mem. at 5 ¶¶ 13-14; ANPAC Opp. Mem. at v ¶¶ 13-14.)

[8](Checketts Mem. at 6 ¶¶ 15-16; ANPAC Opp. Mem. at v ¶¶ 15-16.)

**ANALYSIS**

Both sides assert that no material facts are genuinely in dispute and that summary judgment is appropriate on all issues as a matter of law. *See, e.g.*, *Valdez v. Squier*, 676 F.3d 935, 943 (10th Cir. 2012) ("Summary judgment is appropriate when 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" (quoting Fed. R. Civ. P. 56(a))).

The parties posit that the question now before the court is whether Utah Code Ann. § 31A-22-305, as amended in 2000, required ANPAC (1) to send the Checketts an additional explanation of the purpose of Underinsured Motorist Coverage ("UIM") and the cost of increasing that coverage up to the same policy limits as their existing liability coverage, or (2) to provide maximum UIM coverage under the Checketts policy at some time after January 1, 2001, unless ANPAC obtained an additional waiver from the Checketts that complied with the requirements of the 2000 amendment, or both.

As amended by the Utah Legislature in 2000, the Utah Underinsured Motorist statute read in pertinent part:

> (9) (a) Underinsured motorist coverage under Subsection 31A-22-302(1)(c) provides coverage for covered persons who are legally entitled to recover damages from owners or operators of underinsured motor vehicles because of bodily injury, sickness, disease, or death.
>
> (b) For new policies written on or after January 1, 2001, the limits of underinsured motorist coverage shall be equal to the lesser of the limits of the insured's motor vehicle liability coverage or the maximum underinsured motorist coverage limits available by the insurer under the insured's motor vehicle policy, unless the insured purchases coverage in a lesser amount by signing an acknowledgment form provided by the insurer that:
>
> (i) waives the higher coverage;

-5-

(ii) reasonably explains the purpose of underinsured motorist coverage; and

(iii) discloses the additional premiums required to purchase underinsured motorist coverage with limits equal to the lesser of the limits of the insured's motor vehicle liability coverage or the maximum underinsured motorist coverage limits available by the insurer under the insured's motor vehicle policy.

\* \* \* \*

(f) (i) A named insured may reject underinsured motorist coverage by an express writing to the insurer that provides liability coverage under Subsection 31A-22-302(1)(a).

(ii) This written rejection shall be on a form provided by the insurer that includes a reasonable explanation of the purpose of underinsured motorist coverage and when it would be applicable.

(iii) This rejection continues for that issuer of the liability coverage until the insured in writing requests underinsured motorist coverage from that liability insurer.

(g)(i) In conjunction with the first two renewal notices sent after January 1, 2001, for policies existing on that date, the insurer shall disclose in the same medium as the premium renewal notice, an explanation of the purpose of underinsured motorist coverage and the costs associated with increasing the coverage in amounts up to and including the maximum amount available by the insurer under the insured's motor vehicle policy.

(ii) The disclosure shall be sent to all insureds that carry underinsured motorist coverage limits in an amount less than the insured's motor vehicle liability policy limits or the maximum underinsured motorist coverage limits available by the insurer under the insured's motor vehicle policy.

Utah Code Ann. § 31A-22-305(9)(a)-(b), (f), (g) (Supp. 2001) (effective May 1, 2000).

As the Checketts correctly point out, automobile insurance policies already existing on January 1, 2001 trigger different UIM coverage notification requirements than do new policies written on or after that date.  Utah Code Ann. § 31A-22-305(9)(b) (Supp. 2001) governed  "new policies written on or after January 1, 2001," and Utah Code Ann.

§ 31A-22-305(9)(g) (Supp. 2001) governs policies that already existed on that date.

Under section 9(b), new policies written on or after January 1, 2001 must provide UIM coverage with limits equal to the lesser of (1) the limits of the insured's motor vehicle liability coverage or (2) the maximum UIM coverage available under the insured's motor vehicle policy,[9] "unless the insured purchases coverage in a lesser amount by signing an acknowledgment form . . . that waives the higher coverage."  Utah Code Ann. § 31A-22-305(9)(b)(i) (Supp. 2001).  That acknowledgment form, in turn, must reasonably explain the purpose of UIM coverage and disclose the additional premiums required to purchase UIM coverage at the maximum level defined by § 31A-22-305(9)(b)(iii).  Absent that waiver—or the outright rejection of UIM acknowledged on a similar form provided by the insurer—the Utah statute mandates that UIM coverage be provided at that maximum limit.[10]

In contrast, Utah Code Ann. § 31A-22-305(9)(g) (Supp. 2001) required that insurers send an explanation of the purpose of UIM coverage and the costs associated with increasing the coverage in amounts up to and including the maximum amount available—again as defined by

---

[9]In *General Sec. Indem. Co. of Arizona v. Tipton*, 2007 UT App 109, 158 P.3d 1121, *cert. denied*, 168 P.3d 819 (Utah 2007),  the Utah Court of Appeals acknowledged that

> what is meant by the phrase "available by the insurer under the insured's . . . policy," . . . is facially ambiguous.  However, in light of the other language in that provision, as well as the legislative history of the 2000 amendment, we interpret "the maximum available . . . under the insured's motor vehicle policy," . . ., to mean the maximum available under the *type* of policy Tipton purchased, or an amount she *could have purchased*, not the amount she actually purchased.

2007 UT App 109, at ¶ 20, 158 P.3d at 1126-27 (emphasis in original; footnote omitted).

[10](*See* Checketts Mem. at 7-8.)

§ 31A-22-305(9)(b)(iii) (Supp. 2001)—to all insureds who then carried UIM coverage in an amount less than that maximum limit, and to do so with the first two renewal notices sent after January 2001.[11]

### Utah Code Ann. § 31A-22-305(9)(g) (Supp. 2001) Did Not Apply to the Checketts' Policy in Existence on January 1, 2001

ANPAC insists that the 2000 amendment also draws a distinction between the UIM notification requirements that apply to insureds who already carried *some* UIM coverage, though not the maximum available, and insureds who rejected UIM coverage in its entirety.[12]   Under Utah Code Ann. § 31A-22-305(9)(g)(ii) (Supp. 2001), an explanation of the purpose of UIM coverage and the costs associated with increasing UIM coverage to the maximum need only be sent to insureds under policies already existing on January 1, 2001 that carried some UIM coverage, not those who had rejected UIM coverage altogether.

The language of § 31A-22-305(9)(g) supports this conclusion, as does the legislative history of the 2000 amendment.[13]   The 2000 amendment originated as Substitute Senate Bill 189

---

[11](*See id.* at 8.)

[12](*See* ANPAC Mem. at 3-8.)

[13]The Checketts argue that the language of § 31A-22-305(9)(g)(ii) may fairly be read to support the contrary conclusion, suggesting that the phrase "insureds that carry underinsured motorist coverage limits in an amount less" than the maximum is ambiguous.  *See, e.g.*, *Pearson v. South Jordan City*, 2012 UT App 88, ¶ 24, --- P.3d ----, 2012 WL 1033946, at *6 ("Because each of these interpretations is plausible, we conclude that the statute is ambiguous.  *See Marion Energy, Inc. v. KFJ Ranch P'ship*, 2011 UT 50, ¶ 15, 267 P.3d 863 (indicating that a statute is ambiguous when its language is 'susceptible to two or more reasonable interpretations').")  Thus, in determining the correct reading of § 31A-22-305(9)(g)(ii), the court may consider legislative history and public policy considerations.  *See In re Kunz*, 2004 UT 71, ¶ 8, 99 P.3d 793, 794 ("'[i]f we find the provision ambiguous . . . we then seek guidance from the legislative history and relevant policy considerations.'" (quoting *In re Worthen*, 926 P.2d 853, 866 (Utah
(continued...)

-8-

in the 2000 General Session of the Utah Legislature.  The sponsor of the bill, Senator Michael

Waddoups, explained its purpose on the floor of the Senate in these terms:

> This bill is brought as a way to solve a small problem. . . .  Let me explain
> to you the problem and how we have solved it with the bill.  Many times when
> someone purchases an automobile insurance policy, they purchase a policy with a
> liability coverage, and let's use 300,000 as the example.  You may have purchased
> a liability on your policy for 300,000.  To be competitive, sometimes a few
> companies have actually put in a rider that would have the uninsured and the
> underinsured coverage be less.  Maybe they would write those at 50,000, whereas
> your overall liability was 300,000.  We have found that many times the purchaser
> did not know that this was a change in their coverage, and when they did have an
> accident and went to collect, they found that they were only covered to the 50,000
> when they thought they had the 300.  So the purpose of this bill is to indicate that
> when a policy is sold with a liability coverage, that if the uninsured and the
> underinsured are going to be less, that they have to have a place for the insured to
> sign off and indicate, "Yes, we know it's less."  We're not saying they can't do
> that, because sometimes people indeed do want to do that.  In fact, they can write
> it as low as 10,000 if they want to.  But the problem has been that many times
> people didn't know it.  They just assumed, perhaps incorrectly, that they were
> having the larger limit all the way across, and as a result they—they got caught
> unawares and didn't have the full coverage.  So, this puts in for uninsured and
> underinsured a place for them to say "Yes, I want a lower coverage," if indeed
> they do.  And if they don't, then the coverage for those would be same as the
> master liability coverage. . . .

Floor Debate on S.B. 189-S1, 53rd Utah Leg., Gen. Sess. (February 15, 2000) (statement of Sen.

Michael G. Waddoups).  On the floor of the House of Representatives, Representative Susan

Koehn echoed Senator Waddoups' explanation:

> What this bill does is says, when you're purchasing insurance, that the
> underinsured coverage will be the same as the liability coverage you have, unless
> you choose not to take that.  But what it presumes, is that the levels will be the
> same, so that the consumer gets what they believe they're buying, or they
> understand what they're buying, [and] it provides a way that if you don't want
> that, then you can sign a waiver saying "I recognize I'm taking a lesser amount of
> underinsured coverage."  So, it is not mandating any coverage onto a consumer,

---

[13](...continued)
1996)).

> but it is affirmatively informing them, and showing that they've been informed
> that they are assuming less coverage, they're taking less coverage. . . .

Floor Debate on S.B. 189-S01, 53rd Utah Leg., Gen. Sess. (Mar. 1, 2000) (statement of Rep.

Susan J. Koehn).

Thus, the problem primarily to be remedied by the 2000 amendment involved consumers

who may purchase or who had already purchased automobile insurance policies carrying

uninsured and underinsured motorist coverage without realizing that the amount of that coverage

was in fact less than their general liability coverage. Section 31A-22-305(9)(g) required insurers

to provide an explanation to existing policyholders in 2001 who had less than the maximum UIM

coverage under their policies, detailing of the purpose of UIM coverage and the costs associated

with increasing the coverage in amounts up to and including the maximum amount available.[14]

Section 31A-22-305(9)(b) required that insurers give essentially the same explanation to

customers purchasing new policies after January 1, 2001 if the UIM coverage under their policies

was going to be less than the statutory maximum.  *See* Utah Code Ann. § 31A-22-305.3(2)(b)

(Supp. 2011).[15]  Customers purchasing new policies could still reject UIM coverage altogether,

but must do so "on a form provided by the insurer that includes a reasonable explanation of the

purpose of underinsured motorist coverage and when it would be applicable."  Utah Code Ann.

31A-22-305(9)(f)(ii) (Supp. 2001); *see* Utah Code Ann. § 31A-22-305.3(2)(g)(ii) (Supp. 2011)

---

[14]"The 2000 amendment was prompted by a concern that consumers lacked adequate information about UM coverage when purchasing automobile insurance," *Tipton*, at ¶ 11, and the same may be said of UIM coverage.

[15]Section 31A-22-305(9)(b) of the 2000 amendment has been renumbered as indicated above, and was subsequently amended—most recently in 2012, when it was renumbered as § 31A-22-305.3(3)(a).  *See infra* note 23.

(repealed May 8, 2012).

Yet nothing in the 2000 amendment undertook to alter the circumstances of customers who had previously rejected or waived all UIM coverage under policies already in existence on January 1, 2001—the Checketts' situation in this case.

The Checketts argue that an existing insured who had rejected UIM coverage altogether did indeed "carry underinsured motorist coverage limits in an amount less than" the statutory maximum under the 2000 amendment, (Checketts Mem. at 10 ("the Checketts' UIM coverage was $0 and was therefore in an amount less than liability policy limits")), but as ANPAC suggests, this strains the language of § 31A-22-305(9)(g)(ii), and reaches beyond the "small problem" that Senator Waddoups' bill was intended to solve.

In contrast to the 2000 amendment, the UIM notice requirement enacted in 1992 plainly encompassed all policies in existence on January 1, 1993:

> In conjunction with the first three renewal notices sent after January 1, 1993, for policies existing on that date, the insurer shall notify the insured of the availability of underinsured motorist coverage along with estimated ranges of premiums for the coverage.  The department shall provide standard language to be used by insurers to fulfill the insurers' duty under this Subsection.

Utah Code Ann. § 31A-22-305(9)(c)(ii) (1999).  This language was mirrored in part in the original language of Senate Bill 189, introduced by Senator Waddoups on February 3, 2000:

> (g)  In conjunction with the first three renewal notices sent after January 1, 2000, for policies existing on that date, the insurer shall provide notice to the insured that reasonably explains the purpose of underinsured motorist coverage and discloses the additional premiums required to purchase underinsured motorist coverage with limits equal to the limits of the insured's motor vehicle liability policy.

But the language of the 1st Substitute Senate Bill 189 that was recommended by the Senate

Transportation and Public Safety Committee on February 10, 2000—and that ultimately became § 31A-22-305(9)(g)(ii)—is more narrowly tailored.

Prior to the 2000 amendment, Utah Code Ann. § 31A-22-305(9)(c)(i) (1999) provided:

> For new policies or contracts written after January 1, 1993, a named insured may reject underinsured motorist coverage by an express writing to the insurer that provides liability coverage under Subsection 31A-22-302(1)(a).  This rejection continues for that issuer of the liability coverage until the insured in writing requests underinsured motorist coverage from that liability insurer.

The Checketts' 1996 policy was governed by this provision—incorporated by the 2000 amendment as § 31A-22-305(9)(f)(i) and (iii)—and it remains uncontroverted that Sandra Checketts rejected UIM coverage "by an express writing to" ANPAC, as recounted above.

ANPAC concedes that they did not send notice to the Checketts pursuant to Utah Code Ann. § 31A-22-305(9)(g) after January 1, 2001, but nothing in § 31A-22-305(9)(g) required ANPAC to do so.  At least to that extent, ANPAC is entitled to summary judgment.

### Reconciling the Scope of Utah Code Ann. § 31A-22-305(9)(c)(i) (1999) with the Effect of Utah Code Ann. § 31A-22-305(9)(b) (Supp. 2001)

The remaining question is whether any circumstance arose between January 1, 2001 and June 18, 2007 that triggered the operation of Utah Code Ann. § 31A-22-305(9)(b) (Supp. 2001), requiring ANPAC to provide maximum UIM coverage under the Checketts policy unless ANPAC obtained an additional waiver of UIM coverage from the Checketts that conformed with either § 31A-22-305(9)(b) or § 31A-22-305(9)(f).

The 2000 amendment did not require consumers to purchase UIM coverage in any amount.  Nor did it revamp or even attempt to revisit UIM coverage under all automobile insurance policies already in existence on January 1, 2001, whether or not the insureds already

carried UIM coverage in any amount.  The enactment of the 2000 amendment—by itself—did not require ANPAC to offer or provide UIM coverage to the Checketts or obtain another waiver of UIM coverage in conformity with its new notice requirements.  *Compare State Farm Mut. Auto. Ins. Co. v. Steury*, 787 N.E.2d 465, 471-72 (Ind. Ct. App. 2010) (amended statute required that offer of UIM coverage "must be made available on both newly issued policies and the renewal policies").

The Checketts assert that by 2007, "there were sufficient material changes to the insurance contract between the Checketts and ANPAC to create a new policy under the UIM statute and trigger the statutory requirement for ANPAC to make the UIM Notifications and obtain a UIM Waiver," relying upon *Iverson v. State Farm Mut. Ins. Co.*, 2011 UT 34, 256 P.3d 222, among other authorities.[16]  They point to the addition of at least one of their teenage daughters to the policy early in 2007, resulting in a significant increase (80+%) in the insurance premiums payable to ANPAC, and to changes in the number and type of vehicles to be covered. When issued in 1996, the Checketts' policy insured two vehicles and an RV.  By March of 2007, the RV coverage had been dropped and ANPAC insured four Checketts vehicles, none of which were covered under the original 1996 policy.[17]

According to *Iverson*, "a court must first determine whether a 'new policy' existed on or after January 1, 2001, before it can ascertain whether an insurer has complied with the UIM Statute."  2011 UT 34, at ¶ 10, 256 P.3d at 224-25.  In making that determination, "the legislative history and policy considerations underlying the UIM Statute support a broader definition of

---

[16](Checketts Mem. at 10-11.)

[17](*Id.* at 11-12.)

'new policy' that includes not only new contractual relationships but also material changes to an existing policy that alter the risk relationship between the insurer and the insured." *Id.* at ¶ 15, 256 P.3d at 226.[18]  As *Iverson* explains, this broader definition finds support in public policy:

> As a society, we depend on insurance. At its core, insurance is a product designed to manage risk.  We have an interest in protecting people who endeavor to use the insurance system to manage this risk.  We want them to make informed decisions. And when life presents new risk to the insured, we conclude that the Legislature has formulated a rule that allows the insured to reconsider her insurance situation in a direct and meaningful way.  We believe that the Legislature intended the term "new policy" under the statute to be broad enough to achieve its stated educational goals and to be interpreted in a way that allows the maximum number of insureds to read and sign a document that emphasizes the potentially catastrophic consequences associated with choosing not to purchase UM/UIM coverage.

*Id.* at ¶ 19,   P.3d at 227.  *Iverson* embraced the broader definition of "new policy" because "this approach most effectively achieves the increased education and informed decision making the Legislature intended.  It allows people to reconsider their insurance coverage in response to life changes that may alter how much risk they are willing to bear." *Id.* at ¶ 20.

    *Iverson* instructs that

---

[18]As the *Iverson* court observes,

> Many other jurisdictions that have interpreted similar UM/UIM statutes have found that material changes to an existing insurance contract can create a new policy for the purpose of triggering the statutory requirement to reoffer UM/UIM insurance or obtain a waiver from the insured.  *See, e.g.*, *Matheny v. Glen Falls Ins. Co.*, 152 F.3d 348, 354 (5th Cir. 1998); *Allstate Ins. Co. v. Kaneshiro*, 998 P.2d 490, 497 (Haw. 2000); *Nicholson v. State Farm Mut. Auto. Ins. Co.*, __ N.E.2d __, 2010 WL 1208887, at *6–9 (Ill. App. Ct. 2010); *Richardson v. Lott*, 928 So. 2d 567, 569 (La. Ct. App. 2006); *Folstad v. Farmers Ins. Exch.*, 210 N.W.2d 238, 240 (Minn. 1973) (per curiam); *May v. Nat'l Union Fire Ins. Co.*, 918 P.2d 43, 44 n.2 (Okla. 1996); *Beauchamp ex rel. Beauchamp v. Sw. Nat'l Ins. Co.*, 746 P.2d 673, 676 (Okla. 1987); *Koop v. Safeway Stores, Inc.*, 831 P.2d 777, 779–80 (Wash. Ct. App. 1992).

*Id.* at ¶ 15 n.8.

-14-

to determine whether a change to an existing policy is so material that it creates a
new policy under the statute, the totality of the circumstances must be considered.
In this analysis, the primary focus should be on whether the change to the policy
would meaningfully alter the risk relationship between the insurer and the insured.
Relevant, but not determinative, considerations may include:

  1.     Whether the change to the policy was one requested by the
         insured or a routine or ministerial change made by the
         insurance company.

  2.     Whether in response to the change, the average insured
         would want to reevaluate the amount of risk she would be
         willing to bear under the policy.  And

  3.     Whether the character of the changes would lead the
         average insured to believe she was receiving a new policy.

We conclude that these questions, along with any other relevant considerations
focused on the type of changes made to the policy, will help courts determine
whether an individual has a "new policy" under the UIM Statute such that an
affirmative waiver of UIM coverage is required.

*Id.* at ¶ 22, 256 P.3d at 228 (footnote omitted) (citing *Lovoi v. Ladreyt*, 655 So. 2d 387, 389 (La.

Ct. App. 1995) ("The jurisprudential trend requires a new waiver when the insured has requested

a change in either the insured person, vehicle, risks, or coverage limits.") (emphasis omitted)),

*superseded by statute* as stated in *Am. Deposit Ins. Co. v. Myles*, 783 So. 2d 1282 (La. 2001)).

      ANPAC argues that *Iverson* may be distinguished from this case because the Iversons had

not rejected UIM coverage in writing, as the Checketts did in 1996.  ANPAC relies on the

language of Utah Code Ann. § 31A-22-305(9)(c)(i) (1999), providing that "a named insured may

reject underinsured motorist coverage by an express writing to the insurer that provides liability

coverage," and that "[t]his rejection continues for that issuer of the liability coverage until the

insured in writing requests underinsured motorist coverage from that liability insurer."  The

Checketts having rejected UIM coverage in writing, ANPAC insists that the rejection remains

effective under § 31A-22-305(9)(c)(i), and the parallel language of the 2000 amendment found in Utah Code Ann. § 31A-22-305(9)(f)(iii) (Supp. 2001), and subsequently in Utah Code Ann. § 31A-22-305.3(2)(g)(iii) (Supp. 2011) (repealed May 8, 2012), unless and until the Checketts made a written request for UIM coverage.  Otherwise, applying *Iverson* in this case "would require that subsection 9(f)(iii) be read out of the UIM statute" because it "effectively abolishes the plain language of subsection 9(f)(iii) by cancelling otherwise valid UIM rejections every time a material change is made to the policy."[19]

The Utah Supreme Court has observed on several occasions that """An insurance policy is merely a contract between the insured and the insurer."""  *Equine Assisted Growth and Learning Ass'n v. Carolina Cas. Ins. Co.*, 2011 UT 49, ¶ 8 266 P.3d 733, 735 (footnote omitted) (quoting *Benjamin v. Amica Mut. Ins. Co.*, 2006 UT 37, ¶ 14, 140 P.3d 1210 (quoting *Alf v. State Farm Fire & Cas. Co.*, 850 P.2d 1272, 1274 (Utah 1993))); *see U.S. Fidelity v. U.S. Sports Specialty*, 2012 UT 3, ¶ 14, 270 P.3d 464, 469 (same).  "All duties and obligations arising from this first-party contract of insurance are contractual in nature." *Tucker v. State Farm Mut. Auto. Ins. Co.*, 2002 UT 54, ¶ 14, 53 P.3d 947, 951; *see Beck v. Farmers Ins. Exch.*, 701 P.2d 795, 800 (Utah 1985) (observing that "in a first-party relationship between an insurer and its insured, the duties and obligations of the parties are contractual rather than fiduciary").

The relationship between insurer and insured is rooted in and governed by their insurance contract.  Their relationship exists because the contract exists, and the duration of that insured-

---

[19](ANPAC Opp. Mem. at 8.)  ANPAC overstates the issue.  *Iverson* does not require a finding of a "new" policy for purposes of the UIM statute "every time a material change is made to the policy."  *Iverson* asks "whether the change to the policy would *meaningfully alter the risk relationship* between the insurer and the insured" under the totality of the circumstances.  2011 UT 34, at ¶ 22, 256 P.3d at 228 (emphasis added).

insurer relationship depends upon the duration of the underlying contract.

A written rejection of UIM coverage arises from the formation of the insurance contract as that process is guided by statute, and it bears upon that contract's terms.  The Utah UIM statute prescribes the form and also the effect of such a rejection, namely that it "continues for that issuer of the liability coverage until the insured in writing requests underinsured motorist coverage from that liability insurer," all within the context of the contractual relationship defined by the insurance contract as to which UIM coverage was rejected.  The statute thus assures that for the duration of that insurance contract—including the renewal, reinstatement, reissuance, substitution, or amendment of that contract—the insured's written rejection excuses the insurer from making any further offer or obtaining any further waiver of UIM coverage under that contract, unless and until the insured makes a written request for UIM coverage.  *See* 9 Steven Plitt, Daniel Maldonado & Joshua D. Rogers, *Couch on Insurance* § 122:44 (3d ed. 2008) ("By statute, the insured's initial rejection . . . of UM/UIM coverage is usually effective for subsequent policy renewals, replacements or substitutions unless the insured requests UM/UIM coverage from the insurer in writing." (footnote omitted)).

Insurer and insured have no legal relationship apart from the insurance contract they make, and thus a rejection of UIM coverage made in that context has no meaning beyond that context, and thus can have legal effect only within the context of the insurance contract for which it was given.  Likewise the scope of Utah Code Ann. § 31A-22-305(9)(c)(i) (1999) (and its successor provisions) must be defined in light of the context in which it operates, namely the formation and duration of a specific insurance contract.

This court declines ANPAC's invitation to read § 31A-22-305(9)(c)(i) as extending the

effect of a written rejection of UIM coverage beyond the context of the insurance contract for which it was given, to somehow govern the making of a "new" contract notwithstanding the express language of Utah Code Ann. § 31A-22-305(9)(b), which expressly governs the terms of UIM coverage under "new" policies.  *Iverson* instructs that for purposes of § 31A-22-305(9)(b), "new" means *new* in the broader sense, that is, "not only new contractual relationships but also material changes to an existing policy that alter the risk relationship between the insurer and the insured."  2011 UT 34, at ¶ 15, 256 P.3d at 226; *see also* 9 *Couch on Insurance* § 122:44 ("A number of courts require the insurer to make a new, meaningful offer of UM/IUM coverage or obtain a new rejection of coverage from the insured when the renewal, replacement, or substitution policy is materially different from the policy originally issued." (footnote omitted).)

Remembering that "[a]n insurance policy is a contract that defines the risk relationship of the insurer and the insured," *U.S. Fidelity v. U.S. Sports Specialty*, 2012 UT 3, ¶ 21, 270 P.3d 464, 471, making changes to a policy that meaningfully alter that risk relationship fundamentally alters the contract itself.  When that occurs, Utah Code Ann. § 31A-22-305(9)(b) (Supp. 2001), as construed in *Iverson*, required insurer and insured to revisit the question of UIM coverage anew, consistent with the broader purposes of the 2000 amendment.[20]  Far from reading § 31A-

---

[20]We must keep in mind that these "'statutes are designed to *protect insureds* by providing compensation to those who are injured or killed by uninsured motorists or *other financially irresponsible motorists*' and that the 'statutes are designed for the benefit of insureds and not insurers. [They are] adopted to *benefit the insured motorist*, and [are] *not intended to relieve . . . insurers of primary responsibility . . . or to benefit them in any way.*'"  *Lopez v. United Auto. Ins. Co.*, 2009 UT App. 389, ¶ 17, 222 P.3d 1192, 1196-97 (quoting *Tipton*, 2007 UT App 109, ¶ 13, 158 P.3d at 1125 (emphasis in original)), *aff'd in part, rev'd in part on other grounds*, 2012 UT 10, 274 P.3d 897; *see also* 9 *Couch on Insurance* § 122:10.

22-305(9)(c)(i) out of the statute,[21] or arbitrarily "canceling otherwise valid UIM rejections," this conclusion simply limits the temporal scope of that section according to its essential context: the duration of the insurance contract for which each rejection of UIM coverage was given.[22]

### *Iverson* and the Checketts' Policy

Applying the *Iverson* standards to the uncontroverted facts in this case, this court is satisfied that from and after the point on or before March 6, 2006 that the Checketts' teenage daughter Alisha was added to their ANPAC coverage—with the corresponding cost increase that nearly doubled the Checketts' premiums—taken together with the increase in the number of vehicles covered by ANPAC under their original policy, the risk relationship between ANPAC and the Checketts had been "meaningfully altered" under the *Iverson* standard.  Consequently, from and after that point, a "new policy" within the meaning of Utah Code Ann. § 31A-22-305(9)(b) (Supp. 2001) came into existence, triggering the requirements of that section

---

[21]The court "'assumes that each term included in the statute was used advisedly, and we seek to give effect to every word, clause[,] and sentence[,] . . . if such can be reasonably done.'" Lopez, 2012 UT 10, at ¶ 10, 274 P.3d at 900-01 (footnote omitted) (quoting *State v. Parduhn*, 2011 UT 57, ¶ 21, 266 P.3d 765, 770 (internal quotation marks omitted)); *see Warne v. Warne*, 2012 UT 13, ¶ 36, --- P.3d ----, 2012 WL 748261, at *8 ("Under our rules of statutory construction, we must give effect to every provision of a statute and avoid an interpretation that will render portions of a statute inoperative.  *Hall v. Utah State Dep't of Corr.*, 2001 UT 34, ¶ 15, 24 P.3d 958. To achieve this goal, we construe the provision at issue "with every other part or section so as to produce a harmonious whole."  *Sill v. Hart*, 2007 UT 45, ¶ 7, 162 P.3d 1099 (internal quotation marks omitted).")

[22]Other courts construing similar provisions have reached similar conclusions.  *See May v. Nat'l Union Fire Ins. Co. of Pittsburgh*, 84 F.3d 1342, 1345-46 (10th Cir. 1996) (finding that material change in liability policy limit resulted in "new policy" requiring new UIM waiver); *Matheny v. Glen Falls Ins. Co.*, 152 F.3d 348, 350-54 (5th Cir. 1998) (concluding that addition of "inexperienced new driver" with a 38% premium increase was a "material change in the risk insured by the policy" resulting in a "new policy" (applying Louisiana law)); *Nicholson v. State Farm Mut. Auto. Ins. Co.*, 949 N.E.2d 666, 672-75 (Ill. Ct. App. 2010) (finding that increase in liability policy limit resulted in "new policy" requiring new UIM waiver).

concerning the inclusion or waiver of UIM coverage.[23]  ANPAC obtained no further written

waiver or rejection of UIM coverage from the Checketts on or after March of 2006.  Absent an

additional written waiver or rejection under their new policy, Utah Code Ann. § 31A-22-

---

[23]The most recent amendment to the Utah Underinsured Motorist Insurance statute, enacted by the Utah Legislature in 2012 with an effective date of May 8, 2012, codifies a modified version of the *Iverson* standard:

> (b) For purposes of this Subsection (3), "new policy" means:
>   (i) any policy that is issued which does not include a renewal or reinstatement of an existing policy; or
>   (ii) a change to an existing policy that results in:
>   (A) *a named insured being added to* or deleted from *the policy*; or
>   (B) a change in the limits of the named insured's motor vehicle liability coverage.

House Bill 167, 2012 Gen. Sess., 2012 Utah Laws ch. 283, § 3 (emphasis added).  Moreover, the Legislature expressly made this "new policy" standard retroactive:

> (e) (i) Subsection (3)(b) applies retroactively to any claim arising on or after January 1, 2001 for which, as of May 1, 2012, an insured has not made a written demand for arbitration or filed a complaint in a court of competent jurisdiction.
>
> (ii) The Legislature finds that the retroactive application of Subsection (3):
> (A) does not enlarge, eliminate, or destroy vested rights; and
> (B) clarifies legislative intent.

It does not appear from the record before this court that the Checketts themselves either "made a written demand for arbitration or filed a complaint in a court of competent jurisdiction" by May 1, 2012;  ANPAC filed the complaint commencing this action.  Thus it would appear that the new language of Utah Code Ann. § 31A-22-305.3(b) applies retroactively to compel the conclusion that the addition of their daughter Alisha to the Checketts' ANPAC policy on or before March 6, 2006 resulted in a "new policy" for the purposes of § 31A-22-305.3(a), requiring ANPAC thereafter to provide UIM coverage to the Checketts in the maximum amount "unless a named insured rejects or purchases coverage in a lesser amount by signing an acknowledgment form" that meets that section's requirements—which ANPAC acknowledges was not done.

   The 2012 amendment also repealed § 31A-22-305.3(g), formerly Utah Code Ann. § 31A-22-305(9)(f) (Supp. 2001), and re-enacted essentially the same language of former Utah Code Ann. § 31A-22-305(9)(g) (Supp. 2001) as new § 31A-22-305.3(3)(j).

305(9)(b) (Supp. 2001) required that the coverage under the Checketts' policy with ANPAC include UIM coverage equal to the maximum amount as defined by the statute, namely $100,000 per person.

The parties having demonstrated that there exists no genuine issue of material fact, and that each  is entitled to judgment as a matter of law on specific issues addressed by their respective Rule 56 motions,

**IT IS ORDERED** that the defendants' Motion for Summary Judgment (dkt. no. 11), is GRANTED IN PART and DENIED IN PART, and defendants are entitled to judgment against the plaintiff declaring that from and after March 6, 2006, the coverage provided under their automobile insurance policy with ANPAC included underinsured motorist coverage pursuant to Utah Code Ann. § 31A-22-305(9)(b) (Supp. 2001), in the maximum amount provided for by that section, in this case not less than $100,000 per person;

**IT IS FURTHER ORDERED** that plaintiff's Motion for Summary Judgment (dkt. no. 13), is GRANTED IN PART and DENIED IN PART, and plaintiff is entitled to a declaratory judgment stating that the notice requirements of Utah Code Ann. § 31A-22-305(9)(g) (Supp. 2001) did not apply to the Checketts' automobile insurance policy in existence on January 1, 2001 because pursuant to Utah Code Ann. § 31A-22-305(9)(c)(i) (1999), the Checketts had

already rejected in writing underinsured motorist coverage in its entirety under that policy.

LET JUDGMENT BE ENTERED ACCORDINGLY.

DATED this 21st day of May, 2012.

BY THE COURT:

BRUCE S. JENKINS
United States Senior District Judge